Unsealed JUN 1 1 2008

FILED by __IG__ D.C.
ELECTRONIC

June 02, 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

Case No.: __**08-21568-CIV-UNGARO/SIMONTON**__

QISDA CORPORATION
(formerly BENQ CORPORATION),
a Taiwanese corporation, and
BENQ AMERICA CORP.,
a California corporation,

        Plaintiffs,

v.

JUTAI 661 EQUIPAMENTOS
ELETRONICOS, LTDA., a Brazilian
corporation, GILBERTO ESCAURIZA,
CARIBE CELULAR, INC, a Florida
corporation, and WAY SYSTEMS, INC.,
a Delaware corporation.

        Defendants.

_____/

## COMPLAINT

Plaintiffs, Qisda Corporation ("Qisda", formerly under the name of BenQ Corporation), and BenQ America Corp. ("BenQ America"), through their undersigned attorneys, sue Defendants Jutai 661 Equipamentos Eletronicos, Ltda. ("Jutai"), Gilberto Escauriza ("Escauriza"), Caribe Celular, Inc. ("Caribe"), and WAY Systems, Inc. ("WAY Systems"), and allege as follows:

### THE PARTIES

1.      Plaintiff Qisda, formerly under the name of BenQ Corporation, is a corporation incorporated under the laws of Taiwan with its principal place of business at 157 Shan-Ying



Road, Gueishan Taoyuan 333, Taiwan, R.O.C.

2.      Plaintiff BenQ America is a corporation incorporated under the laws of California, having its principal place of business at 53 Discovery, Irvine, California.  BenQ America is a subsidiary of and ultimately owned 100% by Qisda.

3.      Plaintiffs Qisda and BenQ America are referred to collectively as "Plaintiffs."

4.      Defendant Jutai is a limited liability company incorporated under the laws of the Federative Republic of Brazil, having its principal place of business at Avenida Jutaí, no. 661 Distrito Industrial, Manaus, Amazonas, Brazil.

5.      Defendant Escauriza is, upon information and belief, a resident of the state of Florida.  Upon information and belief, he is principal owner and shareholder of Caribe and holds himself out as the controlling principal of Jutai.

6.      Defendant Caribe is a corporation incorporated under the laws of the state of Florida, having its principal place of business at 245 Southeast 1st Street, Suite #435, Miami, Florida.

7.      Defendant WAY Systems is a corporation incorporated under the laws of the state of Delaware, having its principal place of business at 200 Unicorn Park, Woburn, Massachusetts.

8.      Defendants Jutai, Escauriza, Caribe, and WAY Systems are referred to collectively as "Defendants."

### JURISDICTION AND VENUE

9.      This Court has jurisdiction under Section 39 of the Lanham Act, 15 U.S.C. § 1121, and Sections 1331 and 1367 of the Judicial Code, 28 U.S.C. §§ 1331 and 1367.

10.     Venue lies pursuant to 28 U.S.C. § 1391.  Jurisdiction is proper under the federal and Florida long-arm statutes.

## SUBSTANCE OF THE ACTION

11.    This action arises out of Defendants' unauthorized use of Plaintiffs' trademark and patents in Florida, Brazil, Colombia and the United States, Defendants' misappropriation of Plaintiffs' trade secrets, trademarks and proprietary materials, and Defendants' infringement and dilution of Plaintiffs' established trademark rights in the "BenQ" and "BenQ-Siemens" trademarks – all in violation of United States and Florida law.

12.    BenQ and BenQ-Siemens have gained a worldwide reputation for quality, service, and innovation in the mobile phone and mobile phone service industry. This Court should protect that reputation by ensuring that the "BenQ" trademark is only utilized by those companies and individuals licensed to do so.

## FACTS COMMON TO ALL CLAIMS FOR RELIEF

### BenQ America and Qisda are Registered Owners of the "BenQ" Trademark

13.    BenQ America is the sole registered owner of the BenQ trademark within Brazil and Colombia, holding all legal and proprietary rights of the trademark "BenQ" in those countries.

14.    Qisda, the ultimate parent company of BenQ America, is the sole registered owner of the BenQ trademark within the United States of America and owns certain patents for mobile telephones and know-how related to the assembly and/or manufacturing of the BenQ branded mobile telephones, including accessories. The BenQ trademark is registered under U.S. Patent and Trade Office Reg. No. 2,906,921 in International Class 09.   A true copy of the USPTO Trademark Principal Register is attached as Exhibit "A". The various Patents at issue are U.S. Patent Nos. 6,128,513; 6,804,506; 6,343, 104; 5,648,967; 6,600,731 and 6,343,104 as set forth in Exhibit "B".

15. In 2005, Qisda, then known as BenQ Corporation, acquired Siemens AG's mobile devices business.

### BenQ/Qisda/BenQ America Enter Into Licensing Agreement With Jutai

16. On June 28, 2007, Qisda (under its former name of BenQ Corporation) and BenQ America entered into an agreement with Defendant Jutai to license the BenQ mark and BenQ-owned technology to Jutai (the "License Agreement"). A true and correct copy of the License Agreement is attached as Exhibit "C".

17. Pursuant to the License Agreement, Jutai was licensed to "manufacture and/or assemble only in the City of Manaus, State of Amazonas, Brazil, and sell, only in Latin America (except Mexico), mobile telephones and accessories using the BenQ Owned Technology and bearing the 'BenQ' trademark without any other trademark or name." (License Agreement §1.2).

18. Jutai was to cease "all assembly and/or manufacturing of the Products (including any work in progress) at midnight on the date of the expiration of the Licenses Term." The License Term was eight (8) months. Jutai would have a period of three (3) months from the date of expiration or termination of the Licenses Term to *sell* all finished Products. (License Agreement §1.2).

19. At the expiration or termination of the Licenses Term, Jutai was responsible for removing or obliterating any and all references to the "BenQ" trademarks from any raw material and work in progress. (License Agreement §1.2).

20. Pursuant to the License Agreement, Jutai expressly acknowledged that it did not have any rights to manufacture and/or assemble any mobile telephone, including accessories, bearing trademarks or brand names "Siemens" and/or "BenQ-Siemens" and/or any derivatives thereof. Jutai expressly agreed that if it desired to secure a license for the "Siemens" and/or

"BenQ-Siemens" trademarks, it would need to negotiate with the respective BenQ and Siemens companies accordingly. (License Agreement §1.1).

21.     Jutai never obtained a license for the "Siemens" or "BenQ-Siemens" trademarks.

**Transition Support Agreement**

22.     Jutai and Qisda entered into Transition Support Agreement ("Transition Agreement") to support Jutai in the establishment of its operation.  A true and correct copy of the Transition Agreement is attached as Exhibit "D".

23.     On June 28, 2007, Maigre Participações Ltda. ("Maigre"), a limited liability company organized and existing in accordance with the laws of Brazil, purchased all outstanding quotas in Jutai accounting for 100% of Jutai's equity participation.  (Transition Agreement ¶A).

24.     Pursuant to the Transition Agreement, after Maigre acquired Jutai, Jutai was to "commence a transition to develop its own brand of electronic goods," while at the same time continuing "to fulfill all the obligations under applicable warranties, customer care services, and claims arising or related to Jutai's manufacture, assembly, and/or sale (before Maigre's acquisition of Jutai) of 'Siemens' and 'BenQ-Siemens' mobile telephones as required by applicable law and contractual obligations." (Transition Agreement ¶B).

25.     Also pursuant to the Transition Agreement, Qisda would provide support to Jutai during the transition period through the License Agreement and the provision of spare parts for warranty services outlined in the Transition Agreement. (Transition Agreement ¶D).

26.     Jutai acknowledged that, " . . . in addition to the direct legal and financial effect on [Jutai], its failure to meet the Warranties obligations [under Brazilian law and the Transition Agreement], has a commercially detrimental impact on the "Siemens," BenQ-Siemens," and "BenQ" brands.  Therefore, [Jutai agreed] to honor and fulfill the Warranties obligations; failure

to do so [would] entitle BenQ to remedies under applicable law, in addition to any other remedies provided in the [Transition] Agreement." (Transition Agreement §1.3).

### BenQ/BenQ America Terminates Licensing and Transition Agreements

27.     After the execution of the License Agreement and the Transition Agreement, Jutai constantly failed to fulfill its obligation to honor the warranties and provide customer care for "Siemens," "BenQ Siemens," and "BenQ" branded mobile telephones, as required by those agreements, despite Qisda's repeated demands.  Consequently, on January 18, 2008, pursuant to Section 5.1(ii) of the License Agreement and Section 6.1 of the Transition Agreement, Qisda served Jutai with a notice to cure and demand for Jutai to reinstate customer care for warranty services for "Siemens," "BenQ Siemens," and "BenQ" branded mobile telephones within a period of twenty (20) days from receipt of the notice.  The deadline to answer that letter was February 11, 2008.

28.     When Qisda received no response by the deadline, it terminated the Licensing Agreement and the Transition Agreement effective February 11, 2008.

29.     Qisda thereafter demanded that Jutai immediately discontinue all assembly, manufacture, and/or sale of any and all BenQ branded mobile telephones.

30.     Defendants subsequently acknowledged that the agreements were terminated and that they had no legal authority to use the BenQ Mark, and/or the related cellular telephone brands "Siemens" and "BenQ-Siemens".

### Escauriza Invests in Jutai

31.     Upon information and belief, Escauriza acquired a controlling interest in Jutai and, for all intents and purposes, controls, manages and directs the actions of Jutai.

32.     Upon information and belief, Escauriza closed the administrative offices of Jutai in Sao Paulo and left no forwarding address and terminated the employment of all but a handful of employees on the administrative side of Jutai.

33.     However, upon information and belief, Escauriza maintained the factory in Brazil, continued to employ the factory employees, and commenced manufacturing of BenQ-Siemens branded mobile telephones, fully aware that Jutai does not have trademark and patent licenses to manufacture mobile telephones bearing the "BenQ" trademark or the related cellular telephone brand names, "Siemens" or "BenQ-Siemens".

### Defendants Infringe on Plaintiffs' Trademark Rights

34.     Upon information and belief, Escauriza is holding himself out as Jutai's chief representative, offering to provide prospective customers with BenQ-Siemens mobile phones *even though the Licensing Agreement has been terminated – and indeed the Licensing Agreement expressly prohibits all manufacture and sale of Siemens and BenQ-Siemens products* (Licensing Agreement §1.1).

35.     Additionally, since mid-April 2008, it has been widely reported by Brazilian media outlets that Escauriza bought the BenQ brand in Brazil and was taking over its manufacturing plant.   Escauriza is identified as a Paraguayan businessman living in Miami, who owns a virtual store engaged in the sale of cellular equipment and accessories.   *See*, "The Problematic Benq Is For Sale", http://portalexame.abril.com.br/revista/exame/edicoes/0916/ gestaoepessoas/m0157311.html, a copy and certified translation of which are attached as Exhibit "E"; *see also*, *O Estado de Sao Paolo* Newspaper, Business Section B15, April 18, 2008, a copy and certified translation of which are attached as Exhibit "F".   Upon information and belief, that virtual store is Defendant Caribe.

7

36.     Neither Qisda nor BenQ America has ever sold or offered to sell the trademark or the patent rights to any of the Defendants.

37.     Rather, as set forth above, upon information and belief, Escauriza has purchased a controlling interest in Jutai, and is, in violation of the Lanham Act, improperly holding himself out as the owner of the BenQ trademark and technology in Brazil.     Escauriza's actions are intended to and/or are having the effect of confusing consumers and the marketplace, in competition with and to the detriment of Qisda and BenQ America, the lawful owners of the trademark and patents.

38.     Defendants' actions in violation of Plaintiffs' legal rights to the trademark and patents are knowing and intentional.     Defendants Jutai, Escauriza, and Caribe have **expressly acknowledged** in an email message sent to Qisda and BenQ America by Jutai's in-house attorney, on behalf of Jutai, that his client did not have a valid license to sell BenQ or BenQ-Siemens products.   In that same message, Jutai's attorney requested Qisda to reinstate the License Agreement.

39.     Further, upon information and belief, in violation of the Lanham Act, Escauriza has met with COMCEL, the largest cellular phone operator in Colombia regarding prospective sales of approximately 20,000 BenQ trademarked mobile telephones.

40.     Upon information and belief, Escauriza has also violated the Lanham Act by selling approximately 10,000 "BenQ-Siemens" or "Siemens" branded mobile telephones and promised to sell an additional 40,000 units to WAY Systems.     In fact, WAY Systems' website displays an unauthorized "Siemens" branded cellular telephone.   A copy of the printout from WAY Systems website is attached as Exhibit "G".     Defendants have never had the right to

manufacture "Siemens" cellular telephones nor to place the "Siemens" brand name upon any products they manufacture.

41.     Upon information and belief, Escauriza's goal is to try to manufacture and sell 500,000 units – at a rate of approximately 4,000 units per day – before he is "caught" and ordered by a court to stop doing so.  Plaintiffs believe that Defendants Jutai, Escauriza, and Caribe have sufficient parts and components to manufacture the 500,000 units in their manufacturing plant located in Manaus, Brazil.

42.     Upon information and belief, Escauriza is using Caribe to perpetrate this violation of U.S. law.

## Defendants Have Admitted Violating Plaintiffs' Trademark Rights

43.     Subsequent to Jutai's breach of the Transition Support Agreement, Qisda hired another company, B2X Care Serviços Tecnologicos Ltda. ("B2X"), to perform the warranty obligations and customer care on the products, which Jutai had failed to provide under the License and Transition Agreements.

44.     B2X's Mercosur General Director recently spoke to Jutai's Chief Financial Officer, who acknowledged that Jutai, Ecauariza and Caribe do not possess the proper license or right to be selling the "BenQ", "BenQ-Siemens", and/or "Siemens" products.

## FIRST CLAIM FOR RELIEF FOR
## FEDERAL TRADEMARK INFRINGEMENT

44.     Defendants' use or intended use of a copy, variation, reproduction, simulation or colorable imitation of the Plaintiffs' marks is likely to cause confusion, mistake or deception in connection with Defendants' mobile phone products and services, thus causing harm to the general public.

45.     Defendants' use or intended use of a copy, variation, reproduction, simulation or colorable imitation of Plaintiffs' marks is willful, in bad faith, and with full knowledge of Plaintiffs' prior use and ownership of the marks.

46.     Defendants' acts constitute infringement of Plaintiffs' federally registered trademarks in violation of Section 32(1) of the Lanham Act, 15 U.S.C. §1114(1).

**SECOND CLAIM FOR RELIEF FOR**
**FEDERAL UNFAIR COMPETITION**

47.     Defendants' distribution, use or intended use of a copy, variation, reproduction, simulation or colorable imitation of the Plaintiffs' marks constitutes a false designation of origin, a false description of Defendants' goods and services and a false representation that Defendants' goods and services are sponsored, endorsed, licensed or authorized by, or affiliated or connected with, Plaintiffs, and misrepresents the nature, characteristics and qualities of Plaintiffs' mobile phone services.

48.     Defendants' distribution, use or intended use of a copy, variation, reproduction, simulation or colorable imitation of Plaintiffs' marks is willful, in bad faith, and with full knowledge of Plaintiffs' prior use and ownership of the marks.

49.     Defendants' acts constitute unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

50.     Defendants' conduct has caused and will continue to cause irreparable injury to Plaintiffs unless enjoined by this Court.  Plaintiffs have no adequate remedy at law.

## THIRD CLAIM FOR RELIEF FOR
## TRADE SECRET MISAPPROPRIATION

51.     Plaintiffs' technology and trademark related to the manufacture, assembly, and/or sale of mobile telephones constitute information that derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means.

52.     Defendants can obtain, and indeed have obtained, economic value from the disclosure and use of plaintiffs' confidential and proprietary information.

53.     Plaintiffs' information is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

54.     Defendants acquired the information during the life of the License and Transition Agreements, both of which Plaintiffs terminated pursuant to Defendants' breaches.

55.     Defendants acquired the information under circumstances giving rise to a duty to maintain its secrecy or limit its use.

56.     Defendants knowingly continue to use Plaintiffs' proprietary information without authorization to do so.

57.     Defendants are thereby liable to Plaintiffs under the Uniform Trade Secrets Act, Florida Statutes Section 688.001, *et seq.*

58.     Plaintiffs are entitled to an injunction prohibiting Defendants' use or disclosure of Plaintiffs' trade secrets.

59.     Because of Defendants' knowing and willful misappropriation, Plaintiffs are also entitled to recover their attorneys' fees.

## FOURTH CLAIM FOR RELIEF FOR
## COMMON LAW UNFAIR COMPETITION

60.     Defendants' distribution, use or intended use of Plaintiffs' marks is likely to cause confusion as to the origin, source, sponsorship or quality of Defendants' goods and services, or to cause mistake, or to deceive the public and the trade into believing that Defendants' goods and services originate with or are otherwise authorized by Plaintiffs.

61.     Plaintiffs adopted their trademarks and/or tradenames as a means of establishing good will and reputation and to describe, identify or denominate particular goods offered by them, and to distinguish them from similar goods marketed by others.

62.     Through its association with such goods, Plaintiffs' trademarks and/or tradenames have taken on a special significance that is inherently distinctive.

63.     Defendants have commenced, or intend to commence, the use and distribution of identical or confusingly similar tradenames or trademarks to indicate or identify similar goods marketed by them in competition with Plaintiffs in the same trade area in which Plaintiffs have already established their trademarks or tradename.

64.     Defendants' distribution, use or intended use of Plaintiffs' marks is willful, in bad faith, and with full knowledge of Plaintiffs' prior use and ownership of the marks, and with full knowledge of the reputation and goodwill associated with Plaintiffs and the their marks, and with full knowledge that Defendants have no license or authority to make such use of Plaintiffs' marks.

65.     By misappropriating and trading upon the good will and business reputation represented by the Plaintiffs' marks, unless enjoined by this Court, Defendants will be unjustly enriched at Plaintiffs' expense, and will have harmed, confused and/or deceived the public.

66.    Defendants' conduct constitutes unfair competition with Plaintiffs under the common law of the State of Florida.

67.    Defendants' conduct has caused and will continue to cause irreparable injury to Plaintiffs and the public unless enjoined by this Court. Plaintiffs have no adequate remedy at law.

**FIFTH CLAIM FOR RELIEF FOR
COMMON LAW TRADEMARK INFRINGEMENT**

68.    Plaintiff adopted its trademarks to identify its particular goods and to develop goodwill with customers and with the market in general.

69.    Defendants have used, and intend to continue to use, Plaintiffs' marks in competition with Plaintiff.

70.    Defendants' use or intended use of Plaintiffs' marks is likely to cause confusion, mistake or deception as to the source or sponsorship of its goods and services or as to the relationship of Defendants with Plaintiffs, causing harm to both the Plaintiffs and the general public.

71.    Defendants' conduct constitutes common law trademark infringement under the laws of the State of Florida.

72.    Defendants' conduct has caused and will continue to cause irreparable injury to Plaintiffs unless enjoined by this Court. Plaintiffs have no adequate remedy at law.

**SIXTH CLAIM FOR RELIEF FOR
FEDERAL TRADEMARK DILUTION**

73.    Plaintiffs' marks are strong and famous and have been so from a date prior to Defendants' first use of the marks.

74.    Defendants' admittedly unauthorized use of the marks has caused and will continue to cause dilution of the distinctive quality of Plaintiffs' marks, by lessening their capacity to exclusively identify and distinguish Plaintiffs and their goods and services.

75.    On information and belief, the foregoing actions were done willfully and deliberately and with an intent to reap the benefit of Plaintiffs' goodwill and dilute the distinctiveness of its marks in violation of Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

76.    By reason of the foregoing, Plaintiffs and the public are being harmed and will continue to be harmed unless this Court enjoins Defendants.  Plaintiffs have no adequate remedy at law.

**SEVENTH CLAIM FOR RELIEF**
**FOR TRADEMARK DILUTION**

77.    Defendants are using and/or intend to use a mark, trade name, label or form of advertisement that is likely to dilute the distinctive quality of one or more marks, trade names, labels and/or forms of advertisement owned by Plaintiffs.

78.    Defendants' actions are in violation of Fla. Stat. § 495.151 (1995).

79.    Defendants' admittedly unauthorized conduct has caused and will continue to cause irreparable injury to Plaintiffs unless enjoined by this Court.  Plaintiffs have no adequate remedy at law.

**EIGHTH CLAIM FOR RELIEF**
**FOR FALSE DESIGNATION OF ORIGIN**

80.    Defendants' imitation cellular telephones and accessories are similar in appearance to Plaintiffs' products, however, the imitation cellular telephones and accessories are inferior in quality.   The Defendants' admittedly unauthorized and unlawful actions are likely to

cause confusion to the general public as to the origin of the imitation cellular telephones and accessories.

81.    Defendants infringing use of the BenQ Trademark in Defendants sale of their infringing cellular telephones and accessories are in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

82.    Defendants' admittedly unauthorized and unlawful conduct have caused and will continue to cause irreparable injury to Plaintiffs, including but not limited to their goodwill and reputation, unless enjoined by this Court.

83.    Plaintiffs have no adequate remedy at law.

WHEREFORE, Plaintiffs demand judgment as follows:

1.    Preliminarily and permanently enjoining Defendants, their representatives, employees, agents, officers, directors, licensees, attorneys, successors, affiliates, subsidiaries and assigns, and all those in active concert and participation with any of them, from:

        a.   using and/or disclosing Plaintiffs' trade secrets;

        b.   using the Plaintiffs' marks, or any reproduction, copy, colorable imitation, or confusingly similar variation thereof, or any other indicia or symbols associated with Plaintiffs in connection with any business, product or service;

        c.   using the Plaintiffs' marks, or any reproduction, copy, colorable imitation, or confusingly similar variation thereof, or any other indicia or symbols associated with Plaintiffs in connection with the advertising, distributing, marketing, promotion or offering for sale of any business, product or service;

d. engaging in any other activity constituting unfair competition with Plaintiffs, or constituting an infringement of Plaintiffs' marks, or of Plaintiffs' rights therein;

e. aiding, assisting or abetting any other party in doing any act prohibited by sub-paragraphs (a) through (d).

2. Directing such other relief as the Court may deem appropriate to prevent the trade and public from deriving the erroneous impression that any product or service manufactured, sold, distributed, licensed or otherwise offered, circulated or promoted by Defendants is authorized by Plaintiffs or related in any way to Plaintiffs.

3. Directing that Defendants file with the Court and serve upon Plaintiffs' counsel within fifteen (15) days after entry of the judgment, a report in writing under oath setting forth in detail the manner and form in which Defendants have complied therewith.

4. Awarding Plaintiffs such damages as they have sustained or will sustain by reason of Defendants' trademark infringement and unfair competition.

5. Awarding Plaintiffs all gains, profits, property and advantages derived by Defendants from its unlawful and illegal conduct, ordering disgorgement of same, and, pursuant to 15 U.S.C. § 1107, awarding Plaintiffs an amount up to three times the amount of actual damages sustained as a result of Defendants' willful violation of the Lanham Act.

6. Awarding Plaintiffs equitable relief, exemplary and punitive damages to deter any future acts of willful infringement and/or misappropriation as the Court finds appropriate.

7. Awarding Plaintiffs interest, including prejudgment interest, on the foregoing sums.

8.      Awarding Plaintiffs their costs and disbursements incurred in this action, including reasonable attorneys' fees; and

9.      Awarding Plaintiffs such other and further relief as the Court deems just and proper.

Dated: June ___, 2008

Respectfully submitted,

Michael Diaz, Jr. (Florida Bar No. 606774)
Attorney E-mail Address: mdiaz@diazreus.com
Robert I. Targ (Florida Bar No. 272299)
Attorney E-mail Address: rtarg@diazreus.com
Carlos F. Gonzalez (Florida Bar No. 0494631)
Attorney E-mail Address: cgonzalez@diazreus.com
Brant C. Hadaway (Florida Bar No. 0494690)
Attorney E-mail Address: bhadaway@diazreus.com
DIAZ REUS & TARG, LLP
100 Southeast 2nd Street, Suite 2600
Miami, Florida 33131
Telephone: (305) 375-9220
Facsimile: (305) 375-8050

*Counsel for Plaintiffs*

17

# EXHIBIT "A"

Int. Cl.: 9

Prior U.S. Cls.: 21, 23, 26, 36, and 38

Reg. No. 2,906,921

## United States Patent and Trademark Office

Registered Nov. 30, 2004

### TRADEMARK
### PRINCIPAL REGISTER



BENQ CORPORATION (TAIWAN CORPORA-TION)
157, SHAN-YING ROAD
KWEISHAN, TAOYUAN, TAIWAN

FOR: VIDEO MONITORS, LIQUID CRYSTAL DISPLAYS, PLASMA DISPLAY MONITORS AND PLASMA DISPLAY TELEVISIONS, COMPUTER SOFTWARE COMPRISED OF OPERATING SYSTEM PROGRAMS, BASIC INPUT-OUTPUT SYSTEM PRO-GRAMS TO FACILITATE THE TRANSFER OF DATA AND CONTROL INSTRUCTIONS BETWEEN THE COMPUTER PERIPHERALS, COMPACT DISC DRIVE READ ONLY MEMORY, NAMELY, BLANK COMPUTER COMPACT DISCS, REGISTERED COMPACT DISCS WITH FIGURED MUSIC AND COMPUTER VIDEO GAMES; DIGITAL VIDEO DISK READ ONLY MEMORY, NAMELY, BLANK DIGITAL DISC, REGISTERED DIGITAL DISC WITH FIGURED MUSIC AND DOCUMENTARY FILMS; BLANK COMPACT DISC READ/WRITE, COMPACT DISC READ/WRITE CONTAINING, NAMELY, BLANK COMPUTER DISCS, REGISTERED COM-PACT DISC WITH FIGURED MUSIC, DOCUMEN-TARY FILMS, COLOR LASER PRINTERS, SCANNERS, DIGITAL CAMERAS, DIGITAL CEL-LULAR PHONES, PRIVATE AUTOMATIC BRANCH EXCHANGES, MODEMS, SWITCH BOXES, COM-PUTERS, BLANK COMPACT DISCS, COMPACT DISCS CONTAINING FIGURED MUSIC, DOCU-MENTARY FILMS AND VIDEO GAMES, BLANK COMPACT DISCS-READ-ONLY MEMORY, COM-PACT DISCS-READ-ONLY MEMORY CONTAIN-ING COMPUTER PROGRAMS, COMPACT DISC PLAYERS AND BLANK COMPUTER DISCS, COM-PUTER KEYBOARDS, COMPUTER MICE, COMPU-TER MOUSE, NAMELY, TRACKBALLS, COMPUTER INTERFACE BOARDS, INTEGRATED CIRCUITS CHIPS, CENTRAL PROCESSING UNITS PROCESSORS, BLANK FLOPPY DISCS FOR COM-PUTERS, FLOPPY DISCS, NAMELY, BLANK FLOP-PY DISCS, REGISTERED FLOPPY DISCS WITH MUSIC, COMPUTER VIDEO GAMES, CALCULA-TORS, DIGITAL VIDEODISC DRIVES, PRINTED CIRCUIT BOARDS, HARD DISC DRIVES, VIDEO GAME MACHINES FOR USE WITH TELEVISIONS, VIDEO TAPE RECORDERS, VIDEOCASSETTE RE-CORDERS, RADIOS, AUDIO TAPE RECORDERS, DIGITAL AUDIO TAPE RECORDERS, ELECTRO-NIC PENS, FACSIMILE MACHINES, TELEPHONES, TELEPHONE APPARATUS, NAMELY, INTER-COMS, CORDLESS TELEPHONES, RADIO PAGERS, SEMICONDUCTORS, FLY BACK TRANSFORMER, BAR CODE READERS, COMPUTER CURSOR CON-TROL DEVICES, NAMELY, DIGITIZER TABLETS, OPTICAL CHARACTER RECOGNITION READERS, PERSONAL DIGITAL ASSISTANT, IN CLASS 9 (U.S. CLS. 21, 23, 26, 36 AND 38).

FIRST USE 12-14-2001; IN COMMERCE 1-15-2002.

SN 76-353,465, FILED 12-28-2001.

ANGELA M. MICHELI, EXAMINING ATTORNEY

# EXHIBIT "B"

| Ref patent | Technology Field |
|---|---|
| US 6,128,513 | AMR (GSM optional/WCDMA) |
| US 6,804,506 | System security (WCDMA) |
| US 6,343,104 | Adaptation of modulation (HSDPA in WCDMA) |
| US 5,648,967 | data transmission for one subscriber via multi timeslots to enhance downlink data transmission rate (WCDMA) |
| US 6,600,731 | paging channel  (GPRS) |
| CN 1,149,866 CN 1,108,715 | downlink PTCCH (GPRS) |
| US 6,343,104 | Adaptation of modulation (HSDPA in WCDMA) |

# EXHIBIT "C"

## TRADEMARK AND TECHNOLOGY LICENSES AGREEMENT

**THIS TRADEMARK AND TECHNOLOGY LICENSES AGREEMENT** ("Agreement") is made effective as of June 28, 2007 (the "Effective Date") by and between

- **BenQ Corporation**, a company duly incorporated and existing under the laws of Taiwan, with headquarters at 18 Jihu Road, Neihu, Taipei 114, Taiwan, R.O.C. ("BenQ Corp."), and

- **BenQ America Corp.**, a company duly incorporated and existing under the laws of the State of California, United States of America, with headquarters at 53 Discovery, Irvine, California, U.S.A. ("BenQ America");

  (BenQ Corp. and BenQ America are collectively hereinafter referred to as "Licensors"); and

- **Jutaí 661 Equipamentos Eletrônicos Ltda.** (formerly named **BenQ Eletroeletrônica Ltda.**) a company duly organized and existing under the laws of the Federative Republic of Brazil, having its principal place of business at Avenida Jutaí, n° 661 – Distrito Industrial, in the City of Manaus, Amazonas State, with a Federal Taxpayer number (C.N.P.J.) 07.560.958/0001-86 (hereinafter referred to as "Licensee").

### RECITALS

I.  **WHEREAS,** BenQ America is legally entitled to the proprietary rights of the trademark "BENQ" in Brazil under several Brazilian trademark applications, including application No. 824.501.586, for the trademark "BENQ", in International Class 09 ("Trademark") and BenQ Corp. shares such proprietary rights;

II. **WHEREAS,** BenQ Corp. owns certain patents for mobile telephones and know-how related to the assembly and/or manufacturing of the BenQ branded mobile telephones including accessories, described in Exhibit A ("BenQ Owned Technology");

III. **WHEREAS,** Licensors wish to license such Trademark and BenQ Owned Technology to Licensee, under the conditions stated in this Agreement;

IV. **WHEREAS,** Licensee wishes to be licensed to use the Trademark and BenQ Owned Technology in connection with the manufacture, assembly, and/or sale of mobile telephones by Licensee;

V.  **WHEREAS,** this Agreement is conditioned on Licensee's fulfillment of the terms and conditions in the transition support agreement that BenQ Corp. and Licensee are entering into concurrently on the date hereof ("Transition Support Agreement").

**NOW, THEREFORE,** in consideration of the foregoing and other mutual promises and agreements herein contained, the parties agree as follows:

## 1. <u>TRADEMARK AND BENQ OWNED TECHNOLOGY LICENSES</u>

1.1     Licensee acknowledges that Licensee does not have any rights to manufacture and/or assemble any mobile telephone, including accessories, bearing trademarks "SIEMENS" and/or "BENQ-SIEMENS" and/or any derivatives thereof.     If Licensee desires to secure a license for the "SIEMENS" and/or "BENQ-SIEMENS" trademarks, Licensee shall negotiate with the respective BenQ and Siemens companies accordingly.

1.2     As of June 28, 2007 **Maigre Participações Ltda.,** ("**BUYER**") acquired all outstanding quotas accounting for 100% of the Licensee's equity participation (the "Acquisition Date") and for a period of 8 (eight) months thereafter (the "Licenses Term"), Licensee may manufacture and/or assemble only in the City of Manaus, State of Amazonas, Brazil, and sell, only in Latin America (except Mexico), mobile telephones and accessories using the BenQ Owned Technology and bearing the "**BENQ**" trademark without any other trademark or name (the "Products"). The Trademark and BenQ Owned Technology licenses to manufacture and/or assemble granted herein are restricted to Products that incorporate the raw material existing in Licensee's inventory as of the Acquisition Date listed in Exhibit "B" attached hereto, and shall be limited to the models that Licensee was assembling/manufactured in Brazil on or before the Acquisition Date, (reconfigured by Licensee to be assembled and/or manufactured under the "BenQ" Trademark) listed in Exhibit "C" attached hereto. Since Licensee already has in its possession the know how required for the assembly and/or manufacturing of the Products, no other product support or service shall be provided by BENQ, exception made to access to the BenQ owned servers and BenQ owned software applications which contain information necessary to implement the software reconfiguration of the Products to display the "BenQ" name only and eliminate any display of the "Siemens" name. Licensee shall stop all assembly and/or manufacturing of Products (including any work in progress) at midnight on the date of the expiration of the Licenses Term.  Licensee shall have a period of three (3) months from the date of expiration or termination of the Licenses Term to sell the all finished Products. At the expiration or termination of the Licenses Term, Licensee shall remove or obliterate any and all references to the trademarks "Siemens", "BenQ-Siemens" and "BenQ" from any raw material and work in progress.  If the aforementioned removal or obliteration is not possible, the raw material and/or work in progress shall be scrapped.

1.3     During the Licenses Term, Licensee shall be allowed to include a notice regarding the sale of BenQ Eletroeletrônica Ltda., the change of name and pertinent transition issues in the registered internet domains listed on the "Exhibit C" attached hereto, subject to Licensors' written approval.  For logistic support and transitional purposes only, the Licensee shall also be allowed to use the @BenQ.com e-mail address and server for the Licenses Term, as it is the communication channel with its clients, and each e-mail shall contain a signature block with the name of the employee, his/her tile and the name of the new company  as "Jutaí 661 Equipamentos Eletrônicos Ltda. (formerly BenQ Eletroeletrônica Ltda.)". However, Licensee shall endeavor to expedite the transition process and will aim to desist using the @BenQ.com e-mail address as soon as practicable.

1.4    The transitional Trademark and BenQ Owned Technology licenses provided hereunder are being granted to Licensee on a limited, exclusive, non-assignable, non-transferable and royalty-free basis for the License Period for Latin America (except Mexico) for the assembly and/or manufacture and sale of the Products only. Furthermore, Licensee understands and accepts that the transitional Trademark and Technology licenses provided hereunder are licensed "AS IS", without any representations or warranties, express or implied, of any kind.  Furthermore, Licensee shall be solely responsible for procuring any third party intellectual property licenses, including without limitation patents, trademarks and copyrights, necessary for the assembly, manufacturing and/or sale of the Products.

1.5    As additional support for Licensee to launch its own brand of mobile telephones, Licensors agree that for a period of three (3) years commencing on the Effective Date of this Agreement, Licensors shall not engage directly or indirectly in the sale of mobile telephones handsets only, targeting the Latin America market (excluding Mexico) (the "Restricted Territory") that compete with the mobile telephones handsets of Licensee. The parties hereby agree that parallel and/or grey market imports are an endemic problem in the industry and the Restricted Territory and are not under the control of Licensors or Licensee; consequently Licensors shall not bear any liability of any nature for such parallel or grey market imports.  The provisions in this Section 1.5 is provided specifically to Licensee and it cannot be shared, transferred or assigned in any way by Licensee by contract, operation of law or otherwise and it shall automatically terminate in the event of any of the latter, including without limitation and specifically mentioning any change in the ownership and/or control of Licensee.

1.6    Licensee shall not sub-license the Trademark or disclose BenQ Owned Technology to third parties under any circumstances, unless it is specifically allowed under a duly executed prior written approval by Licensors.  The Licensee may not file any trademark, corporate name, copyright, domain name or any other registration using and/or containing the Trademark licensed herein anywhere in the world.  Furthermore, Licensee may not file for any patent of product or process based upon the BenQ Owned Technology licensed herein anywhere in the world.

1.7    Nothing contained herein and no action by Licensee or Licensors, in the past or during the Licenses Term, shall affect or be interpreted to modify or affect, at any time or under any circumstances, Licensors' respective full proprietary and ownership rights over the Trademark and/or BenQ Owned Technology, as well as any goodwill associated therewith. Furthermore, Licensee hereby declares that, except as expressly provided herein, no other intellectual property rights have been licensed to Licensee.

1.8    Licensee shall adhere to Licensors' trademark use guidelines in effect during the License Term, which shall be provided by Licensors.

1.9    Licensee shall assemble and/or manufacture and sell the Products adhering to the highest quality assurance standards of the industry.

## 2. <u>TRADEMARK AND TECHNOLOGY INFRINGEMENT DEFENSES</u>

2.1.    Licensors may take legal steps against any third party for infringement of the Trademark and BenQ Owned Technology, and in such case any recovery from such lawsuit will be retained by Licensors.

2.2.    Licensee agrees not to commence or attempt to commence any action against any third parties with respect to the Trademark and BenQ Owned Technology without Licensors' prior written consent. Likewise, and in view of clause 2.1 above, Licensee undertakes not to enter into any settlement for the payment of money and/or commitment to cease production of the Products on the basis of a Trademark or BenQ Owned Technology infringement without Licensors' prior written consent. Any costs incurred by the Licensee as a result of failing to observe the provisions of this clause 2.2 will be borne solely by Licensee.

2.3.    Licensee shall immediately notify Licensors of any infringement of the Trademark and BenQ Owned Technology.  Other than providing notification and cooperating with Licensor to defend or prosecute a third party infringement claim, Licensee shall not have any other obligation with respect to a third party infringement claim.

2.4.    Licensors declare that they are the sole parties entitled to the proprietary rights of the trademark "BENQ" in Brazil and Licensor shall defend, at its own cost, any claim of infringement made by a third party against Licensee for any alleged infringement of the "BENQ" Trademark.  Licensee shall provide all necessary assistance to Licensors in the defense of such action and prosecution of any related counterclaims against such third parties.

## 3. <u>WARRANTIES, CUSTOMER CARE AND REGULATORY COMPLIANCE</u>

3.1.    Licensee shall be exclusively and fully responsible for all warranties, customer care, claims, obligations and liabilities of any nature pertaining or related to the manufacture, assembly, sale and/or service of the Products. Licensee's warranties obligations for mobile telephones under the brand "SIEMENS" and "BENQ-SIEMENS" sold by Licensee before the Acquisition Date are limited to Brazil, even if Licensee sold such products outside of Brazil. Licensee's warranties obligations after the Acquisition Date shall include any countries in which Licensee sells any mobile telephones under the brand "SIEMENS" and "BENQ-SIEMENS" as well as the Product after the Acquisition Date.

3.2.    Licensee shall be exclusively and fully responsible for any and all governmental and/or environmental compliance for the assembly, manufacture and/or sale of the Products whenever and wherever assembled or manufactured or sold.

## 4. <u>INDEMNIFICATION</u>

4.1.    Licensee shall defend, fully indemnify and hold the Licensors, their affiliates and subsidiaries, and their respective officers, directors, employees and agents

(collectively the "Indemnitees") harmless from any and all claims made by any third party against the Indemnitees for any activities carried on by the Licensee at any time and from any and all claims, liabilities, obligations and/or causes of action of any kind or nature, known or unknown, arising from or related to any claim for Product warranties, Product liability claims, customer care and/or to Licensee's infringement of any third party intellectual property (including but not limited to patent, copyrights, trademarks, know-how and trade secrets), and any and all resulting or related damages, costs and expenses (including but not limited to attorneys' fees) at any time and of any nature that any third party has or may have against the Indemnitees in Brazil or in any other country due to Licensee's activities at any time.

## 5. **TERMINATION**

5.1.    Notwithstanding the pertinent provisions under Section 1.2 above, this Agreement may be terminated by Licensors for cause, with prior written notification and without prejudice to any of the other applicable legal remedies and without any liability to Licensors, upon the occurrence of any of the following events:

    (i)    if Licensee fails to comply with any of the terms or conditions established herein and does not remedy such default within twenty (20) days from receipt of written notice from Licensors, or within other period agreed between Licensors and Licensee. However, if there is no agreement the twenty (20) days period shall apply; or

    (ii)    if the Transition Support Agreement is terminated for any reason related to a default by the Licensee, with immediate termination upon receipt of notice; or

    (iii)    if Licensee's ownership is sold or control is given to third party(ies) or Licensee goes into bankruptcy, composition with creditors ("*recuperação judicial*") or liquidation or becomes insolvent, with immediate termination upon receipt of notice.

5.2.    Upon the expiration or termination of the License Term or this Agreement, whichever occurs first, Licensee shall immediately cease and desist using the Trademark and BenQ Owned Technology.

5.3.    Licensee shall timely commence to make all necessary changes or amendments to its assembly and/or manufacturing data and process in order to cease using the Trademark upon the expiration or termination of the Licenses Term thereby providing for a new trademark to be used in replacement to the Licensors' Trademark.

## 6. **NOTICES**

6.1.    Any notice required or authorized to be given under this Agreement shall be deemed to be duly given and received if sent by registered mail, postage prepaid, or personal or courier delivery, addressed as follows:

    If to Licensors:

    BenQ Corporation
    18 Jihu Road, Neihu,

Taipei 114, Taiwan, R.O.C.
Attention Legal Department

Phone no.: + 886-2-2799-8600
Fax no.: + 886-2-2799-8332

BenQ America Corp.
53 Discovery
Irvine, CA 92618, USA
Attention: Legal Department

Phone no.: (949) 255-9496
Fax no.: (949) 623-0796

If to Licensee:

Jutaí 661 Equipamentos Eletrônicos Ltda. (formerly BenQ Eletroeletrônica
Ltda.)
Rua Frei Caneca 1380,
5th and 6th floors
01307-002 São Paulo
Attention: Simone Barros
Bruno Pedreira Poppa

Phone no.: 55-11-3549-6900
Fax no.: 55-11-3549-6900

6.2     Each of the above addresses for notice purposes may be changed by any
contracting party by providing appropriate notice hereunder to the others. Notice of
breach or termination must be given by personal delivery or courier and shall be
effective upon actual receipt. Other notices may be given as provided above and shall be
effective upon actual receipt.

## 7.  <u>ARBITRATION</u>

7.1.    All disputes, claims, or controversies arising out of or relating to this
Agreement, including any questions regarding its existence, validity or termination,
enforcement or specific performance of any of its provisions sought by the beneficiaries
hereof (a "Dispute") shall be governed by Brazilian law and shall be settled under the
Rules of the Câmara de Comércio Brasil-Canada, in the City of São Paulo, State of São
Paulo, Brazil (the "CCBC Rules"), and judgment on the award rendered by an arbitral
tribunal may be entered in any court having jurisdiction thereof. Administration of the
arbitration shall be performed by the Court of Arbitration of the Câmara de Comércio
Brasil-Canada.

7.2.    There shall be three arbitrators. Two arbitrators shall be nominated by the parties
in accordance with the CCBC Rules. The third arbitrator, who will act as chairperson of
the arbitral tribunal, shall be nominated by the other two arbitrators. If the two
arbitrators are unable to agree on the nomination of the chairperson within 30 days of

the appointment of the second arbitrator, then the Chairman of the Câmara de Comércio Brasil-Canada shall appoint the chairperson forthwith.

7.3.    The place of arbitration shall be the City of São Paulo, State of São Paulo, Brazil. The CCBC Rules, as amended from time to time, shall apply.

7.4.    Any award of the arbitral tribunal shall be final and binding from the day it is made and not subject to appeal on the law and/or merits to any court.

7.5.    The language of the arbitral proceedings shall be English. All translation costs of documents to be submitted to the arbitral proceedings shall be borne equally by the parties.

7.6.    Nothing in this Section 7 shall be construed as preventing any party from seeking conservatory or similar interim relief in any court of competent jurisdiction.

7.7.    The enforcement of the arbitration award shall be done before the State Courts of the City of São Paulo.

## 8.  MISCELLANEOUS

8.1.    <u>Assignment.</u> This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors and assigns. This Agreement can neither be assigned nor transferred by Licensee, whether in full or in part, without the prior and written authorization of Licensors.

8.2.    <u>Severability.</u> If any clause or part of this Agreement should be found to be invalid for any reason, this shall not affect the effectiveness of the other clauses or parts of this Agreement.

8.3.    <u>Remedies.</u> The rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy by any party hereto shall not preclude or constitute a waiver of its right to use any or all other remedies. Such rights and remedies are given in addition to any other rights and remedies a party may have by law, statute or otherwise.

8.4.    <u>Language.</u> This Agreement shall be executed only in English.

8.5.    <u>Confidentiality.</u>  Both Parties shall keep the terms and conditions of this Agreement confidential and shall not divulge any part thereof to any third party except with the prior written consent of the other Party or if required by applicable law, or as part of an action to enforce this Agreement. Licensors shall not make any official statements regarding the temporary nature of the Trademark and BenQ Owned Technology licenses granted hereunder and shall refrain from confirming or denying any third party inquiries on this issue, except that disclosure is allowed to Licensor's attorneys and accountants and as it may be required by applicable law or contract.

8.6.    <u>No Waiver.</u> The rights granted to Licensee under this Agreement are limited and specific and nothing contained herein may be interpreted as waiver by Licensors of those rights being licensed or any other rights of any nature.

**8.7.**   Entire Agreement.  This Agreement sets forth the entire and only agreement and understanding between the Parties as to the subject matter hereof and supersedes and cancels all prior discussions, unwritten agreements, memorandum, letters of intent, representations and undertakings between them with respect to the subject matter hereof, unless otherwise stated in this Agreement.

**8.8.**   Headings Reference Only.  The headings and sub-headings of the Clauses are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**IN WITNESS WHEREOF** the parties hereto have caused this document to be executed two (2) counterparts of identical form and content, for one sole purpose, together with the undersigned witnesses.

**LICENSORS**

By: _____
Name: _____
Title: _____

By: _____
Name: _____
Title: _____

**LICENSEE**

By: _____
Name: _____
Title:

By: _____
Name: _____
Title:

**Witnesses:**

1.) _____
Name:
ID Card:

2.) _____
Name:
ID Card:

**EXHIBIT A –PATENTS**
**To  the Trademark and Technology Licenses Agreement entered into by and**
**between  Jutaí 661 Equipamentos Eletrônicos Ltda. (formerly named BenQ**
**Eletroeletrônica Ltda.), BenQ Corporation, and BenQ America Corp.**

| Ref patent | Technology Field |
|---|---|
| US 6,128,513 | AMR (GSM optional/WCDMA) |
| US 6,804,506 | System security (WCDMA) |
| US 6,343,104 | Adaptation of modulation (HSDPA in WCDMA) |
| US 5,648,967 | data transmission for one subscriber via multi timeslots to enhance downlink data transmission rate (WCDMA) |
| US 6,600,731 | paging channel  (GPRS) |
| CN 1,149,866 CN 1,108,715 | downlink PTCCH (GPRS) |
| US 6,343,104 | Adaptation of modulation (HSDPA in WCDMA) |

## EXHIBIT B - RAW MATERIAL

**To the Trademark and Technology Licenses Agreement entered into by and
between Jutaí 661 Equipamentos Eletrônicos Ltda. (formerly named BenQ
Eletroeletrônica Ltda.), BenQ Corporation, and BenQ America Corp.**

## EXHIBIT C – FINISHED GOODS

**To the Trademark and Technology Licenses Agreement entered into by and between Jutaí 661 Equipamentos Eletrônicos Ltda. (formerly named BenQ Eletroeletrônica Ltda.), BenQ Corporation, and BenQ America Corp.**

| Product Name | Brand |
|---|---|
| A31 | Siemens |
| A52 | Siemens |
| A53 | Siemens |
| A56 | Siemens |
| A57 | Siemens |
| A60 | Siemens |
| A62/A65 | Siemens |
| A70 | Siemens |
| A71 | Siemens |
| A75 | Siemens |
| A76 | Siemens |
| AL21/AL21a | Siemens |
| AF51 | Siemens |
| AX75 | Siemens |
| AX76 | Siemens |
| C65 | Siemens |
| C66 | Siemens |
| C72 | Siemens |
| C75 | Siemens |
| CF110 | Siemens |
| CF62 | Siemens |
| CF75 | Siemens |
| CX65 | Siemens |
| CX75 | Siemens |
| CXT65 | Siemens |
| EL71 | Benq-Siemens |
| M65 | Siemens |
| MC60 | Siemens |
| SL55 | Siemens |
| SL75/SL80 | Siemens/Benq-Siemens |
| CF51 | Benq-Siemens |
| E61 | Benq-Siemens |
| E61a | Benq-Siemens |
| C71a | Siemens |

# EXHIBIT "D"

## TRANSITION SUPPORT AGREEMENT

This transition support agreement (**"Agreement"**) is made effective this 28th day of June, 2007 (the "Effective Date") and is entered into by and between the following parties:

Jutaí 661 Equipamentos Eletrônicos Ltda. (formerly **BenQ Eletroeletrônica Ltda.**), with a business address at Avenida Jutaí, nº 661 – Distrito Industrial, in the City of Manaus, Amazonas State, with a Federal Taxpayer number (C.N.P.J.) 07.560.958/0001-86 (**"COMPANY"**), herein represented by its legal representative, and

**BenQ Corporation** with a business address at 18 Jihu Road, Neihu, Taipei 114, Taiwan, R.O.C. (**"BENQ"**), herein represented by its legal representative.

## RECITALS

A. WHEREAS, On June 28, 2007 (the **"Acquisition Date"**), **Maigre Participações Ltda.**, a limited liability company organized and existing in accordance with Brazilian laws, enrolled with the CNPJ under No. 08.696.561/0001-89, with offices at Av. Brigadeiro Faria Lima, 1478, 21º andar, cj. 2108, Bairro Jardim Paulistano, in the City of São Paulo, State of São Paulo, Zip Code 01451-001, (**"BUYER"**), purchased all outstanding quotas in the COMPANY accounting for 100% of the COMPANY's equity participation;

B. WHEREAS, after the acquisition of the COMPANY by BUYER, COMPANY will commence its transition to develop its own brand of electronic goods, while at the same time COMPANY will continue to fulfil all the obligations under applicable warranties, customer care services and claims arising or related to the COMPANY's manufacture, assembly and/or sale of "Siemens" and "BenQ-Siemens" mobile telephones as required by applicable law and contractual obligations. The aforementioned "Siemens" and "BenQ-Siemens" mobile telephones shall be collectively referred to as "Products".

C. WHEREAS, COMPANY and BENQ agree that it is in their mutual interest that COMPANY fulfils all its obligations under applicable warranties, customer care and claims arising or related to the COMPANY's manufacture, assembly and/or sale of the Products; and

D. WHEREAS, BENQ will provide support to COMPANY during the transition period through a Trademark and Technology Licenses Agreement, governed under its own terms and conditions, and the provision of spare parts for warranty services of the Products as provided in this Agreement;

NOW WHEREFORE, in consideration of the mutual covenants and promises contained herein, the BENQ and COMPANY agree as follows:

May 11, 2007
SP#63482_v3

# AGREEMENT

1.    Products Warranties.

1.1.    COMPANY herein acknowledges and declares that COMPANY bears the sole responsibility to fulfill the warranty obligations for the Products it assembled, manufactured and/or sold before the Acquisition Date, and also bears the warranty obligations for the "BenQ" branded mobile telephones it assembles, manufactures and sells after the Acquisition Date under the "Trademark and Technology Licenses Agreement" executed between COMPANY and BenQ America Corp. and BenQ Corporation (collectively the "Warranties"). COMPANY's Warranties obligations for Products sold before the Acquisition Date are limited to Brazil, even if COMPANY sold Products outside of Brazil.  COMPANY's Warranties obligations after the Acquisition Date shall include any countries in which Licensee sells Product after the Acquisition Date. The aforementioned "BenQ" branded mobile telephones shall be included in the defined term "Product" for purposes of this Agreement, except as specifically stated herein otherwise. I f COMPANY incurs any expenses to cover warranties for "Siemens" and/or "BenQ Siemens" mobile telephones sold outside Brazil before the Acquisition Date, then BENQ shall reimburse COMPANY for such costs upon presentation of supporting documentation.

1.2.    The fulfillment of the Warranties obligations mentioned in Section 1.1 above include, without limitation, providing customer care services, repairs and swaps, and answering, defending and paying any and all claims of any nature related thereto (collectively "Warranties Services").

1.3.    COMPANY acknowledges that, in addition to the direct legal and financial effect on COMPANY, its failure to meet the Warranties obligations, has a commercially detrimental impact on the "Siemens", "BenQ-Siemens" and "BenQ" brands. Therefore, the COMPANY agrees to honor and fulfill the Warranties obligations; failure to do so will entitle BENQ to remedies under applicable law, in addition to any other remedies provided in this Agreement.

1.4    BENQ acknowledges that the "Warranties Services" do not include the assumption of responsibility regarding any potential litigation or controversy of any kind arising from the use of "Siemens" and "BenQ-Siemens" brand by BENQ in its activities in Brazil, and elsewhere, prior to the Acquisition Date.

2.    Spare Parts for Warranties.

2.1    In the spirit of common interests with COMPANY fulfilling the Warranties obligations, BENQ has been providing and herein agrees to continue to provide the mobile telephone spare parts listed in Exhibit "A" attached herein (the "Spare Parts") to COMPANY's service and repairs providers, exclusively for

the service and repairs of "Siemens", "BenQ-Siemens" and "BenQ" mobile telephones under Warranties. Exhibit A reflects the inventory of the Spare Parts as of January 23, 2007 when they were first made available to COMPANY for the Warranties Services. The purchase cost of the Spare Parts was Five Million Six Hundred and Four Thousand, Two Hundred and Twenty Three and 49/100 United States Dollars (US$5.604.223,49).

2.2     BENQ will not charge COMPANY for the purchase cost of the Spare Parts and COMPANY shall be solely responsible for all taxes, costs, expenses, claims and charges of any nature related to the use, storage, distribution and/or disposal of the Spare Parts at all times, in compliance with all applicable contracts, laws and regulations.

2.3     Title of the Spare Parts belongs to Servitech Corp. ("Servitech"), which is under contract with BENQ to provide the Spare parts for the Warranties Services. The Spare Parts are under the custody and control of Picolli Service Comércio e Prestação de Serviços Ltda. ("Picolli"), as "Mandatário" for Servitech. Picolli distributes the Spare Parts to the COMPANY's Warranties Services providers on an as needed basis and Picolli provides periodical reports and inventory status of the Spare Parts to COMPANY, whose Customer Care Division is in charge of managing everything related with fulfilling the COMPANY's obligations under the Warranties, including the Spare Parts. In the event that Picolli ceases to serve as Mandatário for Servitech for any reason, BENQ shall make the necessary arrangements to continue to provide the Spare Parts. COMPANY shall continue to be responsible for all costs and expenses of any nature related to the use, storage, distribution and/or disposal of the Spare Parts at all times.

2.4     Title to the Spare Parts, management, care, control and distribution thereof will continue as described in Section 2.3 above, unless otherwise agreed in writing by all applicable parties, until all Spare Parts are exhausted or this Agreement is terminated as provided herein.

2.5     Nothing contained in this Agreement shall require or be interpreted as requiring BENQ to provide or supply any additional spare parts for the Warranties Services or any additional support of any nature, under any circumstances. Any parts or material in addition to the Spare Parts that may be needed for the Warranties Services will be procured by COMPANY at its sole cost and expense. Furthermore, BENQ shall not bear any liability for replacement of the Spare Parts or compensation of any nature to COMPANY for the Spare Parts in the event of their loss, theft or damage or destruction by fire, water or any other cause of any nature including Force Majeure.

2.6     Without prejudice to any right or remedies available to BENQ under this Agreement and applicable law, if in BENQ's opinion COMPANY consistently fails to fulfill Warranties obligations, BENQ shall notify COMPANY in writing describing such deficiencies and indicating what actions it recommends to be

taken to remedy the situation. BENQ and COMPANY shall in good faith agree on the proper course of action and the time period for such remedial actions to be carried out. If at the end of such agreed period COMPANY has not adequately remedied the situation, BENQ shall have the right to cease providing the remainder of any Spare Parts without liability to COMPANY.

3.    BENQ Monitoring of Customer Care and Claims Arising or Related to Warranties.

3.1    In consideration of the support for the Warranties provided under this Agreement by BENQ, COMPANY herein agrees to have BENQ monitor COMPANY's management and fulfillment of the Warranties and any and all related customer care issues, services, repairs, claims of any nature (including Fundação de Proteção e Defesa do Consumidor – ("Procon") and court cases), under the terms described herein. BENQ shall be entitled to the monitoring described in this Clause 3 from the date of execution of this Agreement through the end of the fifteenth (15th) month following the end of production date under the Trademark and Technology Licenses Agreement, contemporaneously executed with this Agreement (the "Monitoring Term").

3.2    Throughout the Monitoring Term, COMPANY shall grant to BENQ's appointed representative (whether an employee, consultant or both, as determined by BENQ, collectively the "BenQ Representative"), all the necessary access to information and documentation related to the Warranties for the monitoring purpose, including but not limited to access to service and repair documents/information, reports and the IRIS system, customer, Procon and courts claims and lawsuits (including status reports provided by outside and in-house counsel), reports status of payments to Warranties Services providers and full access to all COMPANY employees involved with the Warranties Services. All the costs required by the BenQ Representative shall be the responsibility of BENQ, including, but not limited to its salary, travel, transportation and living costs. Failure by BENQ to monitor any one aspect or all of the foregoing at any time or for any period, shall not be a waiver of any rights herein.

3.3    During the first eight (8) months from the Acquisition Date, COMPANY shall allow the BENQ Representative to be on site at the COMPANY's offices with the employees managing the Warranties Services. COMPANY shall provide the BENQ Representative with access to a designated desk and facilities to conduct the proper monitoring.

3.4    After the eight (8) months period described in Section 3.4. above, BENQ shall have the right to continue the on-site monitoring for another three (3) months if in BENQ's opinion the Warranties Services and related issues are not being handled properly and the COMPANY's management thereof is detrimentally affecting the "Siemens", "BenQ-Siemens" and/or "BenQ" brands. Notwithstanding Section 3.6 below, after the aforementioned three (3) months

period, BENQ shall analyze the Warranties Services situation on a monthly basis to determine the need for on-site monitoring for the remainder of the Monitoring Period.

3.5     Without prejudice to Section 3.4 above, in the event BENQ determines in its discretion that on-site monitoring is no longer necessary, BENQ's Representative shall continue to monitor the management of the Warranties through occasional visits to COMPANY, communications with COMPANY employees and through reports described in Section 3.5.1 below.

    3.5.1   For any period greater than one (1) month during which BENQ does not have on-site monitoring, COMPANY shall provide the following report: No later than three (3) business days before the 10th of each month, COMPANY shall deliver to BENQ a report in the form to be provided by BENQ, showing (i) the number of mobile telephones under Warranties sent in and repaired by country, product, repair partner and manufacturing date, (ii) a full IRIS dataset for each mobile telephone under the Warranties sent in and repaired, and (iii) a listing of Spare Parts used by part number, customer, volume, shipment details and prices (including taxes and assessments). This reporting requirement shall be in force for the full Monitoring Term, unless otherwise agreed upon by BENQ in a duly authorized and executed document.

3.6     If at any time during the Monitoring Term BENQ determines that the Warranties and related services and claims are not being properly managed by COMPANY, BENQ and COMPANY shall discuss any possible strategies and solutions to address any deficiencies.

4.     Arbitration.

4.1     All disputes, claims, or controversies arising out of or relating to this Agreement, including any questions regarding its validity, interpretation, enforcement and/or specific performance of any of its provisions sought by the parties hereof (a "Dispute") shall be governed by Brazilian law and shall be settled under the Rules of the Câmara de Comércio Brasil-Canadá, in São Paulo (the "CCBC Rules"), and judgment on the award rendered by an arbitral tribunal may be entered in any court having jurisdiction thereof. Administration of the arbitration shall be performed by the Court of Arbitration of the Câmara de Comércio Brasil-Canadá.

4.2     There shall be three arbitrators. Two arbitrators shall be nominated by the parties in accordance with the CCBC Rules. The third arbitrator, who will act as chairperson of the arbitral tribunal, shall be nominated by the other two arbitrators. If the two arbitrators are unable to agree on the nomination of the chairperson within 30 days of the appointment of the second arbitrator, then the

May 11, 2007
SP#63482_v3

Chairman of the Câmara de Comércio Brasil-Canadá shall appoint the chairperson forthwith.

4.3    The place of arbitration shall be São Paulo, SP, Brazil. The CCBC Rules, as amended from time to time, shall apply.

4.4    Any award of the arbitral tribunal shall be final and binding from the day it is made and not subject to appeal on the law and/or merits to any court.

The language of the arbitral proceedings shall be English.   All translation costs of documents to be submitted to the arbitral proceedings shall be borne equally by the parties.

4.5    Nothing in this Section 4 shall be construed as preventing any party from seeking conservatory or similar interim relief in any court of competent jurisdiction.

4.6    The enforcement of the arbitration award shall be done before the State Courts of the City of São Paulo.

5.    Indemnification

COMPANY shall defend, fully indemnify and hold the BENQ, its affiliates and subsidiaries, and their respective officers, directors, employees and agent (collectively the "Indemnitees") harmless from any and all claim made by any third party against the Indemnitees for any activities carried on by the COMPANY at any time and from any and all claims, liabilities, obligations and causes of action of any kind or nature, known or unknown, arising from or related to any claim for Warranties Services claims, customer care and/or to COMPANY's infringement of any third party intellectual property (including but not limited to patent, copyrights, trademarks, know-how and trade secrets) in providing the Warranties Services, and any and all resulting or related damages, costs and expenses (including but not limited to attorneys' fees) at any time and of any nature that any third party has or may have against the Indemnitees in Brazil or in any other country due to COMPANY's activities at any time.

6.    Termination

6.1    This Agreement may be terminated by any of the contracting parties for cause, with prior written notification of non-compliance of any material term or condition to the defaulting party and without prejudice to the notifying party's other applicable legal remedies under this Agreement or applicable law.   If the defaulting party fails to remedy such notified default within twenty (20) days from receipt of the written notice this Agreement will be terminated at the end of such twenty (20) days period.

7.      Notices.

7.1     Any notice required or authorized to be given under this Agreement shall be deemed to be duly given and received if sent by registered mail, postage prepaid or personal or courier delivery, addressed as follows:

If to COMPANY:

Jutaí 661 Equipamentos Eletrônicos Ltda. (formerly BenQ Eletroeletrônica Ltda.)
Rua Frei Caneca 1380, 5th and 6th floors
01307-002 São Paulo, SP
Brazil
Attn.: Simone Barros
Bruno Pedreira Poppa

Phone no.: 55-11-3549-6900
Fax no.: 55-11-3549-6900

If to BENQ:

BenQ Corporation
18 Jihu Road, Neihu,
Taipei 114, Taiwan, R.O.C.
Attention Legal Department

Phone no.: + 886-2-2799-8600
Fax no.: + 886-2-2799-8332

7.2     Each of the above addresses for notice purposes may be changed by providing appropriate notice hereunder. Notice of breach or termination must be given by personal delivery or courier and shall be effective upon actual receipt. Other notices may be given as provided above and shall be effective upon actual receipt.

8.      Miscellaneous.

8.1     Severability. If any clause or part of this Agreement should be found to be invalid for any reason, this shall not affect the effectiveness of the other clauses or parts of this Agreement.

8.2     Remedies. The rights and remedies provided by this Agreement are cumulative, and the use of any one right or remedy by any party hereto shall not preclude or constitute a waiver of its right to use any or all other remedies. Such rights and remedies are given in addition to any other rights and remedies a party may have by law, statute or otherwise.

8.3     Language. This Agreement shall be executed only in English.   All translation costs of documents to be submitted to the arbitral proceedings shall be borne equally by the parties.

8.4     Confidentiality. Both Parties shall keep the terms and conditions of this Agreement confidential and shall not divulge any part thereof to any third party except with the prior written consent of the other Party or if required by applicable law.

8.5     No Waiver. The rights granted to Licensee under this Agreement are limited and specific and nothing contained herein may be interpreted as waiver by Licensor of those rights being licensed or any other rights of any nature.

8.6     Entire Agreement.   This Agreement sets forth the entire and only agreement and understanding between the Parties as to the subject matter hereof and supersedes and cancels all prior discussions, unwritten agreements, memorandum, letters of intent, representations and undertakings between them with respect to the subject matter hereof.

8.7     Headings Reference Only. The headings and sub-headings of the Clauses are inserted for convenience of reference only and are not intended to be a part of or to affect the meaning or interpretation of this Agreement.

**IN WITNESS WHEREOF** the parties hereto have caused this document to be executed in two (2) counterparts of identical form and content, for one sole purpose, together with the undersigned witnesses.

| Jutaí 661 Equipamentos Eletrônicos Ltda. (formerly **BenQ Eletroeletrônica Ltda.**) | **BenQ Corporation** |
|---|---|
| By: _____ Name: Enio Title: | By: _____ Name: MONICA A. P. MELO Title: Attorney - in - fact |
| WITNESS: By: _____ Name: Denise | WITNESS: By: _____ Name: |

# EXHIBIT "E"

**(News article)**

*CELLULAR*

Problem-laden Benq is for sale

The bitter difficulties of cell phones maker BenQ in Brazil seem endless. After three changes of chairman in less than six months, delays in its employees' pay, and over 300 million reais in debts, the company that was purchased last year by investors Enzo Monzani and Conrado Will laid off about 40 employees, and is negotiating the sale of its remains to an unknown Paraguayan businessman who lives in Miami. Gilberto Escauriza – who owns a virtual store that sells cell phones and accessories – is working on the details of a deal to purchase the brand and manufacturing plant. Meanwhile the laid off employees are fighting to receive their pay. Salaries have not been paid since January, and contributions to the FGTS (*mandatory workers pension and unemployment compensation fund*) have not been made for a whole year. Executives say only that BenQ is going through a restructuring process.

# CERTIFICATE OF ACCURACY

I, John Typrin, a professional interpreter and translator for and on behalf of **Liaison Services, Inc.**, hereby certify that the foregoing translation from Brazilian Portuguese into English, (Excerpts and tables from PROCON Report, and separate news items on Bena) attached hereto and consisting of six pages is a true and accurate translation of the original document.

John R. Typrin
Interpreter • Translator
May 30, 2008

John Typrin
3804th Street 2005
USA PHONE: (305) 715-2525

Primeiro lugar - Portal EXAME - Negócios Economia Marketing Finanças Carreira Tecnologia

🌳 Abril.com    SITES ABRILCELULARASSINESHOPPING   **busca**

**Notícias**   **Esportes**   **Diversão**   **Famosos e TV**   **Educação**   **Comportamento**   **Viagem**   **Estilo de vida**   **Tecnologia**

Portal EXAME   **EXAME**

Escreva aqui o que procura na EXAME   **Buscar**

Para usar o Portal EXAME você precisa estar autenticado

E-mail: _____   Senha: _____   **Entrar**

Quinta-feira, 29 de maio de 2008    Faça da Exame sua primeira página | Assine | Conheça o Portal | Fale conosco

## Exame

- **Primeira Página**
- Reportagens
- Primeiro lugar
- Volta ao Mundo
- Gestão & Idéias
- Seu dinheiro

Selecione a edição

## Portal Exame

- **Primeira Página**
- Central do investidor
- Meu Portal Exame
- Anuário de Infra-Estrutura
- Anuário do Turismo
- Estudos Exame
- Anuário do Agronegócio
- Guia de Sustentabilidade
- Guia do Investidor
- Melhores e Maiores
- Melhores Empresas para Trabalhar
- Jack Welch
- CEO TV
- IR 2008
- Leia notícias pelo celular

# Primeiro lugar | 17.04.2008

- Blogs da EXAME
- Newsletter
- RSS

Publicidade

**Tamanho da fonte:** A   A   A

📧 Envie por e-mail

🖨 Preparar para impressão

➕ Adicione ao favoritos

🔗 Compartilhe esta notícia



+ Lidas

+ Votadas

**mais lidos**

Primeiro lugar - Portal EXAME - Negócios Economia Marketing Finanças Carreira Tecnologia



mais impressos

mais enviados

Avalie a
reportagem:

Fraca Boa
Excelente

Média
dos
usuários

Fraca Boa Excelente

### O ... com o Merrill

O e... iel Nasser, antigo dono do banco Excel Econômico, que quebrou em 1998, env... é um imbróglio financeiro. Juntamente com seu filho, Raymond, e seu tio, Albert, ele está sendo processado nos Estados Unidos pelo banco Merrill Lynch, que alega ter 78 milhões de dólares a receber do trio. O banco americano diz ter tomado um calote dos Nasser numa operação no mercado futuro de compra de ações do Bear Stearns, instituição que foi à lona em março. Os Nasser apostaram na alta das ações do Bear pouco antes de o valor dos papéis cair de 30 para 2 dólares. E quem cobriu o prejuízo foi o Merrill Lynch. A operação foi feita por dois fundos de investimento geridos por Raymond em Nova York e por dois fundos comandados por Albert, em Buenos Aires. Ezequiel é citado no processo por ser sócio das gestoras responsáveis por esses fundos. Na ação que tramita na Suprema Corte de Nova York, o Merrill alega: "Desde que abriram contas no Merrill Lynch, os Nasser se envolveram numa série de transações complexas, agressivas e de alto risco (...), que resultaram em perdas maciças para os réus". Raymond nega as acusações: "Os números são fabricados. Na verdade, eles é que nos devem".

PATROCÍNIO

### A Adidas parte para a revanche

A seleção brasileira de futebol é o novo alvo da disputa travada entre as duas maiores fabricantes mundiais de artigos esportivos. Depois de perder o contrato de patrocínio com a esquadra francesa para a Nike, a alemã Adidas quer agora estampar sua marca na camisa da seleção pentacampeã mundial. Executivos da Adidas já ofereceram 60 milhões de dólares anuais para substituir a Nike, que paga 22 milhões por ano à CBF. O valor oferecido é o mesmo que a Nike pagará aos franceses. No mercado, comenta-se que a reação da Adidas tem um potencial muito maior de inflacionar os custos da Nike do que o de assumir, de fato, o fornecimento de material à CBF

CELULAR

### A problemática Benq está à venda

As agruras da fabricante de celulares BenQ no Brasil parecem não ter fim. Depois de três trocas de presidente em menos de seis meses, atrasos nos pagamentos dos funcionários e dívidas que ultrapassam 300 milhões de reais, a empresa comprada no ano passado pelos investidores Enzo Monzani e Conrado Will demitiu cerca de 40 empregados e negocia a venda do que sobrou para um desconhecido empresário paraguaio que vive em Miami. Dono de uma loja virtual de celulares e acessórios, Gilberto Escauriza acerta os detalhes da compra da marca e da fábrica. Enquanto isso, os funcionários demitidos lutam para receber seus pagamentos. Os salários não são pagos desde janeiro e o FGTS não é recolhido há um ano. Os executivos informam apenas que a BenQ passa por um processo de reestruturação.



# EXHIBIT "F"

**"O ESTADO DE SÃO PAULO" – APRIL 18 2008 – BUSINESS SECTION – PAGE B-15**

### FASHION
## "I'M" Fashion Holding: Creditors Oust Owners from Management
#### Enzo Monzani and Conrado Will also sell BenQ cell phone company to foreign businessman

**PICTURE CAPTION:** Breath – Global Capital will provide R$ 20 million, says Mello

**TEXT INSERT: Fund's condition for new loan was for**
                   **Enzo and Conrado to leave management**

**By Patrícia Cançado**

As of yesterday, investors Enzo Monzani and Conrado Will are no longer at the helm of the fashion holding I'M that owns Clube Chocolate as well as the brand Fause Haten. After difficult negotiations, the Rio de Janeiro-based fund Global Capital –one of the company's main creditors – managed to oust them from their financial and managerial positions. The departure of both managers was the condition imposed by the fund to bring in additional capital in the amount of R$ 20 million. The money is expected to bring back breathing space to the group that is presently enmeshed in serious financial problems.

Investors did not sell their shares, but from now on I'M will be lead by a seven-member group: four to be designated by Global Capital, and three by Enzo and Conrado. The agreement was signed last Tuesday. We are putting together a work force. Meanwhile, we have hired an auditing company (KPMG) to find out the real size of the debt; we have also built a business plan to reestablish the merchandise flow at Zoomp which is now a priority because it accounts for 90% of the group's income, said I'M President, Vicente Mello.

The group's critical situation became more conspicuous when fashion designer Alexandre Herchcovitch quit last month. Two weeks ago, Zoomp practically stopped. Some clothing suppliers stopped delivering merchandise because they were not being paid. Employees' paychecks were also delayed since April 5.

Yesterday and today Zoomp's account will receive the first remittance in the amount of R$ 3.5 million. According to Mello, the priority is to update the accounts of employees, service and finished goods providers. Some 40 providers should be paid at this first stage.

A new deposit should take place 15 days later. According to the executive, the money is enough to make wheels turn. "Restarting the supply of merchandise will bring back Zoomp's sales".

The interruption of clothing supplies was very recent, and therefore it did not affect Zoomp's results in the first quarter – Mello explained. He added that the company's sales increased by 28% during the first three months of the year compared to the same period in the previous year.

**TEXT INSERT:**
**Fund's condition for new loan was for Enzo and Conrado to leave management**

Notwithstanding the stormy scenario, global Capital thinks that Zoomp is a promising business. Last year it loaned R$ 30 million to the group, according to sources close to the company. The debt is still active but the fund decided to go ahead with a second loan because it believes in the project, Mello explained. Global Capital decided to require the ouster of Enzo and Conrado due to breach of trust.

Global Capital was created as an arm of Globalvest – a resources management company that succeeded Latinvest whose partners were Luiz Fraga (who is now with his cousin Armínio Fraga at Gávea), and Peter Gruber. The company does not deal with shares funds; it operates exclusively in the area of credit management for medium-sized and low risk corporations.

**BENQ**

Zoomp is Enzo's and Conrado's least problematic business. The great commotion was at the cell phone manufacturer BenQ which has an accrued debt of R$300 million. The investors got rid of that business two weeks ago. The news has not yet been divulged, but Estado (*Translator's note: the newspaper*) has learned that employees were advised of the ownership change earlier this month.

The representative of the new –and mysterious – shareholder has been introduced to the executives. He is Brazilian and lives in a flat in (the city of) Manaus where BenQ's plant is located. The purchaser would be businessman Gilberto Escauriza, a Paraguayan who lives in Miami and sells electronic devices (including cell phones) throughout Latin America. •

# CERTIFICATE OF ACCURACY

I, John Typria, a professional interpreter and translator for and on behalf of Liaison Services, Inc., hereby certify that the foregoing translation from Brazilian Portuguese into English, *"FH" Fashion Holdings Creditors Oust Owners from Management – published in the Business Section of O ESTADO DE SÃO PAULO daily newspaper on April 18 2008*) attached hereto and consisting of XXX pages, is a true and accurate translation of the original document.

John R. Typria
Interpreter • Translator
May 29, 2008

John Typria
Interpreter ......
U S A. PHONE: (707) 316-2529

SEXTA-FEIRA, 18 DE ABRIL DE 2008
O ESTADO DE S. PAULO

# ECONOMIA | B15

| | | |
|---|---|---|
| **Partido para empresas de tecnologia inovadoras** A KMVenture Capital faz a ponte entre empresas e bancos de capital de risco **PÁG B17** | **Pacote estimula produção de trigo** Governo quer aumentar em 25% a produção nacional do cereal já nesta safra de **PÁG B17** | |

# NEGÓCIOS

**MODA**

# Donos da holding de moda I'M são destituídos da gestão por credores

Enzo Monzani e Conrado Will também vendem a empresa de celulares BenQ para empresário estrangeiro



FOTO: ANTONIO MILENA/AE-9/2/2007

Fonte: Global Capital fará aporte de R$ 20 milhões, diz Mello

**Patrícia Conrado**

Desde ontem, os investidores Enzo Monzani e Conrado Will não estão mais à frente da holding de moda I'M, que além da Zoomp, é dona da Clube Chocolate e da grife Fause Haten. Após uma complicada captação, o fundo carioca Global Capital, um dos principais credores da companhia, conseguiu destituir a dupla da posição administrativa. A saída da dupla foi a condição imposta pelo fundo para a entrada de um novo aporte de capital na valor de R$ 20 milhões. A expectativa é que o dinheiro devolva fôlego ao grupo, hoje envolvido em graves problemas financeiros.

Os investidores não venderam as ações, mas a partir de agora a I'M será comandada por um comitê formado por seis gestores - quatro indicados pela Global Capital e dois apontados por Enzo e Conrado. O contrato foi assinado na terça-feira passada. "Estamos monitorando a empresa há algum tempo que contratamos uma auditoria (KPMG) para descobrir o tamanho real da dívida, vamos fazer um plano de

negócios para mercadorias no fluxo de mercadorias na Zoomp, que é a prioridade agora, pois representa 90% da receita do grupo", afirma o presidente da I'M, Vicente Mello.

A situação ainda é complicada e é visível com a saída do fluxo visível com a saída do estilo do sócio é Herchcovici. tol; no mês passado. Há classe-manas, a Zoomp praticamente parou. Algumas confecções deixaram de entregar as mercadorias por falta de pagamento. Os salários dos funcionários também estava atrasado desde o dia 15 de abril.

Sobre como é hoje, a conta da Zoomp estará recebendo a primeira remessa do aporte, no valor de R$ 3,5 milhões. A prioridade, segundo Mello, é acertar as contas com os fornecedores, prestadores de serviços e fornecedores de serviço. Cerca de 40 fornecedores deixarão pagos nesse primeiro momento.

Em 15 dias, está previsto um novo depósito. O dinheiro, de acordo com o presidente, será aplicado para fazer a roda girar novamente. "Se o recebimento de mercadorias é restabelecido, a Zoomp volta a faturar."

Como foi recente, a interrupção na entrega de roupas não chegou a prejudicar o resultado da Zoomp no primeiro trimestre do ano, explica Mello. De acordo com a verdade, a empresa cresceram 25% nos três primeiros meses em comparação com o mesmo período do ano anterior.

**Fundo condicionou novo empréstimo à saída de Enzo e Conrado da gestão**

Apesar do cenário tumultuado, a Global Capital vê na Zoomp um negócio promissor. No ano passado, ela empresou quase R$ 30 milhões ao grupo, segundo fontes próximas à empresa. A dívida ainda existe, mas o fundo resolveu fazer uma segunda aposta, pela avaliação no projeto, explica Mello. A Global Capital decidiu condicionar o novo empréstimo à saída de Enzo e Conrado porque houve quebra de confiança.

A Global Capital nasceu de um braço da administradora de

recursos Globalvest, que por sua vez sucedeu a Latinvest, cujos sócios eram Luiz Fraga (hoje na Gávea com seu primo Armínio Fraga) e Peter Gruber. A empresa, que se dedica a fundo de ações, atua exclusivamente na gestão de crédito para empresas de médio porte e de baixo risco.

**BENQ**

A Zoomp também começou provavelmente da Enzo e Conrado. O planejamento da nova fabricante de celulares BenQ, que acumula dívidas de R$ 300 milhões. Os investidores se livraram do negócio há dias as manas. A notícia ainda não foi divulgada, mas segundo o Estado apurou, os funcionários foram avisados na manhã de ontem no começo deste mês.

O representante do novo - e misterioso - acionista foi apresentado aos executivos. Ele é alemão e está mudando em um fato em Manaus, onde está a fábrica da BenQ. O comprador seria o empresário Gilberto Babarro, um português que vive o setor de telefonia celular (inclusive celulares) na América Latina. ●

# EXHIBIT "G"

Contact Us

Mobile Transaction Terminals for Mobile Payments from Way Systems.

| Company | Solutions | Technology | International | Support | News |

**way**

MERCHANTS
ENTER HERE

RESELLERS &
DISTRIBUTORS
ENTER HERE

*How Mobile
Merchants Can
Increase Revenues*

Search Word(s)

GO

Mobile Transaction Terminals for Mobile Payments from Way Systems.

Worldwide Offices

Our mobile POS solutions, the MTT 1531 and 1581, break down all the barriers to accepting any kind of payment anywhere.

- They're the industry's smallest, sleekest terminals
- They support the widest signal coverage available
- Their security is second to none

The combination of small size, wide coverage, and secure communications makes easy what used to be a nuisance: offering customers the full range of payment options. With the advent of the MTT, many merchants are accepting credit/debit payments for the first time ever. The result? More money.

*"I would say our revenue has increased by 50% once we started accepting credit cards using the MTT."* Richard Dicapua, Celtic Dragon

In addition, WAY's MTT units make true mobility a reality. Click here to learn more about mobility vs. portability, and how our featured product can lead your business into a world of transactions without boundaries.



NEWS



accessor

**TESTIMONIALS**

We are the 3rd largest repair company in [the] area. By accepting credit cards, we've become more valuable to the customers, and it gives them peace of mind...

We provide marine fuel for boats and yachts in the Virgin Islands. We have to maintain a professional image because our customers expect it.

GPRS COVERAGE MAP
View Demo

DEMO

Copyright 2007 WAY Systems Inc. All rights reserved | Legal | Privacy Policy | The AccessorTM Logo is property of Fractal Commerce Inc.

JS 44 (Rev. 2/08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| QISDA CORPORATION, a Taiwan corporation, and BenQ AMERICA CORP., a California corporation | JUTAI 661 EQUIPAMENTOS ELETRONICOS, LTDA., a Brazilian corp., GILBERTO ESCAURIZA, and CARIBE |

(b) County of Residence of First Listed Plaintiff   Taiwan
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Brazil
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

Michael Diaz, Jr., Esquire, DIAZ, REUS & TARG, LLP, 2600 Bank of America Tower, 100 SE 2nd Street, Miami, Florida 33131; Telephone No.: 305-375-9220

Attorneys (If Known)

(d) Check County Where Action Arose: ☑ MIAMI- DADE ☐ MONROE ☐ BROWARD ☐ PALM BEACH ☐ MARTIN ☐ ST. LUCIE ☐ INDIAN RIVER ☐ OKEECHOBEE HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
☑ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

Dade 08CV21568-Ungaro/Simonton

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | **PERSONAL INJURY** ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability / ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** ☐ 660 Occupational Safety/Health | ☑ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle / ☐ 370 Other Fraud | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability / ☐ 371 Truth in Lending | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/Exchange |
| ☐ 195 Contract Product Liability | | ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

a) Re-filed Case ☐ YES ☑ NO     b) Related Cases ☐ YES ☑ NO

## VI. RELATED/RE-FILED CASE(S).
(See instructions second page): JUDGE _____   DOCKET NUMBER _____

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

15 U.S.C. ss. 1114, 1116, and 1125.  Fed. TM infringement, Fed, TM dilutionm, False designation of origin, Fed. unfair competition. common law TM infringement and common law unfair competition

LENGTH OF TRIAL via  10  days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ☑ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE   June 2, 2008

FOR OFFICE USE ONLY
AMOUNT  350.     RECEIPT #  981390
06/02/08

# 08-21568-CIV-UNGARO/SIMONTON

| | FILED by _IG_ D.C. |
|---|---|
| | ELECTRONIC |

## CIVIL COVER SHEET

JS 44 (Rev. 2/08)

**June 02, 2008**

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.) **NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

### I. (a) PLAINTIFFS

QISDA CORPORATION, a Taiwan corporation, and BenQ AMERICA CORP., a California corporation

**DEFENDANTS**

JUTAI 661 EQUIPAMENTOS ELETRON.................... a Brazilian corp., GILBERTO ESCAURIZA, and CARIBE ......

**(b)** County of Residence of First Listed Plaintiff    Taiwan
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Brazil
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Michael Diaz, Jr., Esquire, DIAZ, REUS & TARG, LLP, 2600 Bank of America Tower, 100 SE 2nd Street, Miami, Florida 33131; Telephone No.: 305-375-9220

Attorneys (If Known)

**(d)** Check County Where Action Arose:  ✓ MIAMI-DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE HIGHLANDS

### II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1 U.S. Government Plaintiff
✓ 3 Federal Question (U.S. Government Not a Party)
☐ 2 U.S. Government Defendant
☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

### III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

Dade 08CV21568-Ungaro/Simonton

### IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☒ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

### V. ORIGIN (Place an "X" in One Box Only)

✓ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Re-filed- (see VI below)
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

### VI. RELATED/RE-FILED CASE(S)

(See instructions second page)

a) Re-filed Case ☐ YES ✓ NO    b) Related Cases ☐ YES ✓ NO

JUDGE _____    DOCKET NUMBER _____

### VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

15 U.S.C. ss. 1114, 1116, and 1125.  Fed. TM infringement, Fed, TM dilutionm, False designation of origin, Fed. unfair competition. common law TM infringement and common law unfair competition

LENGTH OF TRIAL via _10_ days estimated (for both sides to try entire case)

### VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: ☐ Yes ✓ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD

DATE    June 2, 2008

FOR OFFICE USE ONLY

AMOUNT  $350.00    RECEIPT #  981390

06/02/08